UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA, ex rel. HAMID (JOE) LAHIJANI,<br><br>                              Plaintiff and Relator,<br><br>              -against-<br><br>DELTA UNIFORMS, INC., and GEORGE ILOULIAN (a/k/a/ GEORGE ILLULIAN), individually,<br><br>                              Defendants. | **ORDER**<br><br>19 Civ. 3290 (PGG) |
| UNITED STATES OF AMERICA,<br><br>                              Plaintiff-Intervenor,<br><br>              -against-<br><br>DELTA UNIFORMS, INC. and GEORGE ILOULIAN,<br><br>                              Defendants. | |

PAUL G. GARDEPHE, U.S.D.J.:

In this qui tam action, Plaintiff-Intervenor United States of America ("Plaintiff" or

the "Government") claims that Defendants Delta Uniforms, Inc. and George Iloulian

(collectively "Defendants") violated the False Claims Act ("FCA"), 31 U.S.C. § 3729 et seq. by

knowingly evading customs duties owed on medical uniforms, footwear, and other apparel

imported into the United States.  (Cmplt. (Dkt. No. 7) ¶ 1)  On July 26, 2022, in United States v.

Iloulian, 21 Cr. 579 (PGG), Defendant Iloulian pled guilty to conspiracy to commit wire fraud in

connection with this same conduct.

In the instant case, the Government has moved for summary judgment against both Defendants on the basis of collateral estoppel, and seeks a judgment in the amount of $1,287,360. (Pltf. Br. (Dkt. No. 25) at 1) Defendants have not opposed the motion or filed appearances in this case.

For the reasons stated below, the Government's motion for summary judgment will be granted.

## BACKGROUND[1]

I. **FACTS**

A. **The False Claims Act Allegations**

Defendant George Iloulian is the owner and president of Defendant Delta Uniforms, Inc. (Pltf. R. 56.1 Stmt. (Dkt. No. 26) ¶ 1) Delta Uniforms "imported clothing and footwear into the United States from manufacturers located abroad, including in China, Pakistan and Bangladesh." (Id. ¶ 2) In connection with those imports, "Delta Uniforms, through its customs broker, submitted information to United States Customs and Border Protection . . . regarding, inter alia, the value of the goods being brought into the country." (Id. ¶ 3) Any customs duties owed to the United States in connection with those imports were "calculated based on the value of the goods declared." (Id. ¶ 5)

The Complaint alleges that Defendants

> engaged in a deliberate and intentional scheme to defraud the United States of
> customs duties from at least 2009 through the present. . . . United States Customs
> and Border Protection ("CBP"), a component of the Department of Homeland

---

[1] The Court's factual statement is drawn from the Government's Local Rule 56.1 statement and accompanying exhibits. To the extent that this Court cites facts drawn from the movant's Local Rule 56.1 statement, it has done so because Defendants have not disputed those facts. See Giannullo v. City of New York, 322 F.3d 139, 140 (2d Cir. 2003) ("If the opposing party . . . fails to controvert a fact so set forth in the moving party's Rule 56.1 statement, that fact will be deemed admitted.") (citations omitted).

> Security, relies on importers to accurately report the nature and value of the goods that importers bring into the United States in assessing customs duties. Defendants, however, submitted fake invoices that deliberately and materially understated the value of their imports. They also submitted fraudulent invoices that misrepresented the fabric content of the goods being brought into the United States. They did so with the purpose and intent to fraudulently reduce the amount of duty that Defendants paid on the goods that they were importing into the country. Through these schemes, Defendants defrauded the United States out of hundreds of thousands of dollars in customs duties.

(Cmplt. (Dkt. No. 7) ¶ 2)

The Complaint further alleges that Defendants engaged in a "double-invoicing" scheme in which they arranged for their exporter to provide them with two sets of invoices:

> The first invoice reflected the amount Defendants actually paid the exporter for the goods; the second invoice fraudulently reflected a fabricated lower amount and was submitted to CBP during the entry process. These two invoices were virtually identical (i.e., they reflected the same invoice number, description of goods, and quantity of goods), except that they stated different prices for the same shipments of goods. Defendants used the amounts on the lower valued invoices to falsely declare the value of the goods to CBP in order to pay less duty.

(Id. ¶ 24)

The Complaint also alleges that Defendants engaged in a "[f]abric [c]ontent [s]cheme" in which they

> made misrepresentations to CBP about the type of fabric used in the clothing that Delta Uniforms was importing. Much of the clothing Delta imported was a mixture of cotton and man-made fibers, including polyester, spandex and Lycra. Generally, goods that are made mostly of cotton are subject to lower duty rates than goods that are made mostly of man-made materials.
>
> In order to reduce the amount of customs duties they would pay to the United States, Defendants submitted false invoices to CBP on certain garment imports that mischaracterized the goods as being made predominantly of cotton, with the intention and expectation that the Government would reasonably rely on the false statements on the invoices.

(Id. ¶¶ 42-43)

The Complaint asserts an FCA claim against Defendants for filing "reverse false claims" – i.e., claims that caused the Government to "incur[] losses in the form of customs duties underpaid by Defendants." (Id. ¶¶ 53, 56)

**B.    The Criminal Proceedings**

On September 23, 2021, the Government obtained an indictment against Defendant Iloulian in United States v. Iloulian, 21 Cr. 579 (PGG) charging him with (1) conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1349; (2) wire fraud in violation of 18 U.S.C. § 1343; and (3) effecting the entry of falsely valued goods in violation of 18 U.S.C. § 541. (Tarczynska Decl., Ex. 1 (Indictment) (Dkt. No. 23-1) ¶¶ 8-10)

The Indictment alleges that Iloulian was the "owner, president, and chief executive officer of an apparel company 'Company-1' located in New York, New York," and that

> [f]rom at least in or about 2010 through at least in or about 2020, GEORGE ILOULIAN, a/k/a "George Illulian," the defendant, and others known and unknown, conspired together to submit fraudulent invoices to United States Customs and Border Protection ("CBP") that understated the value of apparel imported into the United States by Company-1, thereby depriving the United States of hundreds of thousands of dollars of duty revenue.

(Id. ¶ 2) The Indictment further alleges that Iloulian "prepared and submitted false invoices that enabled Company-1 to pay lower customs duties for the goods it was importing from overseas, thereby depriving the United States of duty revenue." (Id. ¶ 3)

The Indictment alleges that Iloulian committed customs fraud by engaging in "(i) a 'double-invoicing scheme,' and (ii) a 'fabric-type scheme.'" (Id.) In connection with the "double-invoicing scheme," the Indictment alleges that

> ILOULIAN utilized two invoices:  One Invoice, referred to at times by ILOULIAN and ILOULIAN's co-conspirators as the "Actual Invoice" or "For Payment Invoice," contained higher prices and reflected what Company-1 actually paid overseas manufacturers for apparel.  The second invoice, referred to

at times by ILOULIAN and ILOULIAN's coconspirators as the "Customs Invoice" or "For Customs Declaration," contained false lower prices. The information in the Customs Invoice was submitted by Company-1, through a customs broker (the "Customs Broker"), to CBP. CBP relied on the information from the Customs Invoice in assessing and collecting customs duties from Company-1. Accordingly, by presenting the Customs Invoice to CBP, Company-1 was able to pay a fraudulently lower amount of customs duties than Company-1 actually owed.

In one version of the double-invoicing scheme, Company-1 directed an overseas manufacturer to send to Company-1 two sets of invoices for the same shipment of merchandise, the Actual Invoice and the Customs Invoice. In a second version of the double-invoicing scheme, the overseas manufacturer provided Company-1 with only the Actual Invoice; a Customs Invoice was created by other means and provided by Company-1 to the Customs Broker

(Id. ¶¶ 4-5)

In connection with the "fabric-type scheme," the Indictment alleges that

Company-1 directed an overseas manufacturer to misstate the composition of the fabric in the apparel in order to obtain a lower duty rate. Specifically, the invoice would indicate that the imported goods were predominantly made of cotton rather than man-made fibers, even though the reverse was true. The information in the invoice was then presented to CBP, which allowed Company-1 to pay a lower amount of customs duties than Company-1 actually owed, because materials containing more cotton than man-made materials are subject to lower duty rates.

(Id. ¶ 6)

On July 26, 2022, Iloulian pled guilty to Count One of the Indictment, which charges him with conspiracy to commit wire fraud. (Pltf. R. 56.1 Stmt. (Dkt. No. 26) ¶ 13) Iloulian admitted to the following conduct in connection with his guilty plea:

THE DEFENDANT: Your Honor, under my company, from 2010 until 2022, I changed some of the invoices for the custom [sic], and I paid less for the duty. And the company was location was [sic] in Manhattan, New York City, and what I did was wrong, and I'm really so sorry about it.

THE COURT: Now, you were the owner and the president of a certain company that was in the apparel business; is that true?

THE DEFENDANT: The company was under my name from 2010 up to 2018, May 2018. I had partner, too, because he didn't invest any money in the company; so everything was under my name.

THE COURT:  And was that company in the apparel business?

THE DEFENDANT:  Yes, your Honor.  Apparel business, specialty in all kind of uniforms.

THE COURT:  Uniforms?

THE DEFENDANT:  Yes.

THE COURT:  And so as part of that business, your company imported certain apparel into the United States?

THE DEFENDANT:  Yes, I did import from China, Pakistan, Bangladesh, and some was just was a domestic business, meaning cotton sold in the United States.

THE COURT:  And when you imported that apparel into the United States, you were obligated to make representations to U.S. Customs about what fabric the apparel was made from, right?

THE DEFENDANT:  The content of the fabric?

THE COURT:  Yes.

THE DEFENDANT:  Yes, yes, the content and the quantity and the price.

THE COURT:  And the price. And did you submit invoices to the U.S. Customs that included a value for the apparel that you were importing that was less than what you had actually paid for it?

THE DEFENDANT:  Yes. If there -- for example -- yes.

THE COURT:  And so as a result of you giving the U.S. Customs inaccurate information as to the prices of the apparel that you had purchased, you ended up paying less in duty than would otherwise have been the case?

THE DEFENDANT:  Yes, your Honor.

THE COURT:  And you understood at the time that what you were doing was wrong and illegal?

THE DEFENDANT:  Yes.

(Tarczynska Decl., Ex. 2 (Plea Tr.) (Dkt. No. 23-2) at 18-20)

During his plea, Iloulian acknowledged that the company he owned and through which he committed customs fraud was "Delta Uniforms."  (Id. at 21)

On July 26, 2022, this Court entered a Consent Preliminary Order of Forfeiture directing Iloulian to forfeit $249,000 to the Government. This amount "represent[ed] proceeds traceable to the commission of the offense charged in Count One of the Indictment." (Tarczynska Decl., Ex. 3 (Consent Preliminary Order of Forfeiture) (Dkt. No. 23-3) at 3)

On April 11, 2023, this Court sentenced Iloulian to six months' imprisonment. (Pltf. R. 56.1 Stmt. (Dkt. No. 26) ¶ 22)

## II.     PROCEDURAL HISTORY

Relator Hamid (Joe) Lahijani commenced an action under the qui tam provisions of the False Claims Act on April 12, 2019. (Relator Cmplt. (Dkt. No. 9))

On September 22, 2021, the Government intervened in this action pursuant to 31 U.S.C. § 3730(b)(2) (Dkt. No. 6) and filed the Complaint the same day. (Dkt. No. 7)

On December 1, 2021, this Court granted the parties' joint motion to stay the instant case pending the resolution of the criminal case against Iloulian. (Dkt. No. 14)

This Court lifted the stay on May 8, 2023, following entry of judgment against Iloulian in the criminal case. (Dkt. No. 19) The order lifting the stay directed Defendants to file an answer within 60 days of the Government's May 4, 2023 letter requesting that the stay be lifted. (Id.) To date, Defendants have not filed an answer or otherwise appeared in this case.

The Government filed the instant motion for summary judgment on February 2, 2024. (Dkt. No. 22) As noted above, the motion is unopposed.

In a June 12, 2024 order, this Court directed the Government to submit supplemental briefing. (Dkt. No. 28) The Government filed a supplemental brief on June 27, 2024. (Dkt. No. 29)

## DISCUSSION

The Government seeks summary judgment on its FCA claim against Defendants Iloulian and Delta Uniforms based on Iloulian's guilty plea and conviction in the parallel criminal case. According to the Government, as a result of Iloulian's guilty plea, Defendants "are estopped from denying that they are liable under the FCA for knowingly submitting these false statements to avoid paying the full amount of duties owed on the imported goods." (Pltf. Br. (Dkt. No. 25) at 6) The Government seeks judgment against Defendants jointly and severally in the amount of $1,287,360. (Id.)

## I.      LEGAL STANDARD

Summary judgment is warranted where a moving party shows that "there is no genuine dispute as to any material fact" and that that party "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute about a 'genuine issue' exists for summary judgment purposes where the evidence is such that a reasonable jury could decide in the non-movant's favor." Beyer v. Cnty. of Nassau, 524 F.3d 160, 163 (2d Cir. 2008) (citing Guilbert v. Gardner, 480 F.3d 140, 145 (2d Cir. 2007)).

In deciding a summary judgment motion, the Court "'resolve[s] all ambiguities, and credit[s] all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment.'" Spinelli v. City of New York, 579 F.3d 160, 166 (2d Cir. 2009) (quoting Brown v. Henderson, 257 F.3d 246, 251 (2d Cir. 2001)). However, a "'party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment. . . . [M]ere conclusory allegations or denials . . . cannot by themselves create a genuine issue of material fact where none would otherwise exist.'" Hicks v. Baines, 593 F.3d 159, 166 (2d Cir. 2010) (alterations in original) (quoting Fletcher v. Atex, Inc., 68 F.3d 1451, 1456 (2d Cir. 1995)).

Where a summary judgment motion is unopposed, "summary judgment, <u>if</u> <u>appropriate</u>, shall be entered against" the non-moving party. <u>Vt. Teddy Bear Co., Inc. v. 1-800</u> <u>Beargram Co.</u>, 373 F.3d 241, 244 (2d Cir. 2004) (emphasis in original) (quoting Fed. R. Civ. P. 56(e)). The district court may not "automatically grant summary judgment on a claim simply because the summary judgment motion . . . is unopposed[, however]." <u>Jackson v. Fed. Exp.</u>, 766 F.3d 189, 194 (2d Cir. 2014). "Rather, it must examine the movant's statement of undisputed facts and the prof[f]ered record support and determine whether the movant is entitled to summary judgment." <u>Id.</u> at 197. In sum, even where the non-moving party "chooses the perilous path of failing to submit a response to a summary judgment motion," <u>Vt. Teddy Bear</u> <u>Co.</u>, 373 F.3d at 244, the district court must "ensure that each statement of material fact is supported by record evidence sufficient to satisfy the movant's burden of production," and "determine whether the legal theory of the motion is sound." <u>Jackson</u>, 766 F.3d at 194. Although the "non-moving party need not respond to the motion . . . [,] a non-response runs the risk of unresponded-to statements of undisputed facts prof[f]ered by the movant being deemed admitted." <u>Id.</u> (citing Fed. R. Civ. P. 56(e)(2)); <u>see also</u> <u>Jones v. Lamont</u>, No. 05 Civ. 8126, 2008 WL 2152130, at *1 (S.D.N.Y. 2008) ("In view of plaintiff's failure to respond to the motion, the well supported factual allegations set forth in defendants' Rule 56.1 statement are deemed admitted."), <u>aff'd</u>, 379 Fed. Appx. 58 (2d Cir. 2010).

## II.    <u>FCA LIABILITY</u>

The Government contends that "Iloulian's guilty plea and criminal conviction estop Defendants from denying FCA liability for the same conduct that resulted in the conviction." (Pltf. Br. (Dkt. No. 25) at 14)

A.    **Applicable Law**

1.    **Liability for Reverse False Claims under the FCA**

The FCA imposes liability on any person who "knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government." 31 U.S.C. § 3729(a)(1)(G). This section of the FCA is referred to as the "reverse false claims" provision, because "'it covers claims of money owed to the government, rather than payments made by the government.'" United States ex rel. Foreman v. AECOM, 19 F.4th 85, 119 (2d Cir. 2021) (emphasis in original) (quoting United States ex rel. Kester v. Novartis Pharms. Corp., 43 F. Supp. 3d 332, 368 (S.D.N.Y. 2014)). This "provision applies whenever a defendant has [fraudulently] decreased 'an obligation' to pay the Government." United States ex rel. Grubea v. Rosicki, Rosicki & Assocs., P.C., 318 F. Supp. 3d 680, 703 (S.D.N.Y. 2018) (quoting United States ex rel. Landis v. Tailwind Sports Corp., 51 F. Supp. 3d 9, 60 (D.D.C. 2014)).

Under Section 3729(a)(1)(G), the Government must show "the existence of an 'obligation' to pay the Government that the defendant 'knowingly conceals or knowingly and improperly avoids or decreases.'" United States ex rel. Miller v. Citigroup Inc., No. 19CV10970 (DLC), 2022 WL 3030707, at *2 (S.D.N.Y. Aug. 1, 2022) (quoting 31 U.S.C. § 3729(a)(1)(G)).

The FCA defines "material" as "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4). A person is "knowing" or acts "knowingly" where he has "(i) has actual knowledge of the information [at issue]; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information." 31 U.S.C.

§ 3729(b)(1)(A).  The FCA does not require "proof of specific intent to defraud." Id.

§ 3729(b)(1)(B).

### 2.    **Issue Preclusion**

"The preclusive effect of a criminal conviction on future civil proceedings is well

established." United States v. Karron, 750 F. Supp. 2d 480, 487 (S.D.N.Y. 2011).  "'[A]

criminal conviction, whether by jury verdict or guilty plea, constitutes estoppel in favor of the

United States in a subsequent civil proceeding as to those matters determined by the judgment in

the criminal case.'" New York v. Julius Nasso Concrete Corp., 202 F.3d 82, 86 (2d Cir. 2000)

(alterations in original) (quoting United States v. Podell, 572 F.2d 31, 35 (2d Cir. 1978)).  "In

order for collateral estoppel to apply the court must determine that '(1) the issues in both

proceedings are identical, (2) the issue in the prior proceeding was actually litigated and actually

decided, (3) there was full and fair opportunity to litigate in the prior proceeding, and (4) the

issue previously litigated was necessary to support a valid and final judgment on the merits.'"

Id. (quoting NLRB v. Thalbo Corp., 171 F.3d 102, 109 (2d Cir.1999)).

For purposes of claims arising under the FCA, the collateral estoppel doctrine is

codified at 31 U.S.C. § 3731(e):

> Notwithstanding any other provision of law, the Federal Rules of Criminal
> Procedure, or the Federal Rules of Evidence, a final judgment rendered in favor of
> the United States in any criminal proceeding charging fraud or false statements,
> whether upon a verdict after trial or upon a plea of guilty or nolo contendere, shall
> estop the defendant from denying the essential elements of the offense in any
> action which involves the same transaction as in the criminal proceeding and
> which is brought under subsection (a) or (b) of section 3730.

31 U.S.C. § 3731(e).  This provision of the FCA "prevents defendants convicted in a criminal

proceeding from denying the essential conduct for which they were convicted." United States v.

Zaky, No. 3:12-cv-01661-WWE, 2015 WL 4603405, at *2 (D. Conn. July 30, 2015).

B.      **Analysis**

1.      **George Iloulian**

The Complaint in the instant case and the Indictment in the criminal case allege that between 2010 and 2020 Iloulian and Delta Uniforms – referred to as "Company-1" in the Indictment – engaged in a scheme to defraud the United States by underpaying customs duties on apparel imported into this country. (Cmplt (Dkt. No. 7) ¶ 2; Tarczynska Decl., Ex. 1 (Indictment) (Dkt. No. 23-1) ¶ 2) The Complaint and the Indictment allege that, in connection with his fraud scheme, Iloulian employed a "double-invoicing scheme," in which he arranged for exporters to provide (1) an invoice that reflected the actual prices paid to overseas manufacturers for imported apparel, and (2) another invoice reflecting false lower prices that he submitted to the customs service for its use in assessing and collecting customs duties. (Cmplt (Dkt. No. 7) ¶¶ 24-25; Tarczynska Decl., Ex. 1 (Indictment) (Dkt. No. 23-1) ¶¶ 4-5) The Complaint and the Indictment further allege that Iloulian also engaged in a "fabric-type scheme" in which he misstated the composition of the fabric that he was importing in order to obtain a lower duty rate. (Cmplt (Dkt. No. 7) ¶¶ 42-43; Tarczynska Decl., Ex. 1 (Indictment) (Dkt. No. 23-1) ¶ 6)

At his July 26, 2022 guilty plea, Iloulian admitted that: "from 2010 until 2022," he and his company "changed some of the invoices for the custom[s] [service], and [he] paid less for the duty"; he "submit[ted] invoices to the U.S. Customs that included a value for the apparel that [he was] importing that was less than what [he] had actually paid for it"; "as a result of [Ilouilian] giving the U.S. Customs inaccurate information as to the prices of the apparel that [he] had purchased, [he] ended up paying less in duty than would otherwise have been the case"; he "understood at the time that what [he was] doing was wrong and illegal." (Tarczynska Decl., Ex. 2 (Plea Tr.) (Dkt. No. 23-2) at 18-20)

Iloulian has therefore admitted that he and his company (1) caused false documents to be submitted to the Customs Service that reflected a lower price for imported goods than he had actually paid; (2) as a result, he and his company paid less in customs duties than he otherwise would have owed; and (3) he knew that what he was doing was wrong and illegal.

These admissions provide a sufficient basis for this Court to grant the Government summary judgment on its claim against Iloulian for filing "reverse false claims" under 31 U.S.C. § 3791(a)(1)(G).

### 2.    Delta Uniforms

Although Delta Uniforms was not charged in the criminal case, it was referred to in the Indictment as "Company-1," and was described as the entity through which Iloulian committed customs fraud.  (Tarczynska Decl., Ex. 1 (Indictment) (Dkt. No. 23-1) ¶ 2)

In general, "a determination in a prior judicial proceeding collaterally estops a claim by a nonparty only if that nonparty was represented by a party to the prior proceeding, or exercised some degree of actual control over the presentation on behalf of a party to that proceeding." Stichting Ter Behartiging Van de Belangen Van Oudaandeelhouders In Het Kapitaal Van Saybolt Int'l B.V. v. Schreiber, 327 F.3d 173, 184-85 (2d Cir. 2003) (citation omitted).  Courts recognize "privity based on representation only if the interests of the person alleged to be in privity were 'represented [in the prior proceeding] by another vested with the authority of representation.'" Id. at 185 (alteration in original) (quoting Monahan v. New York City Dep't of Corr., 214 F.3d 275, 285 (2d Cir. 2000).  The Second Circuit has found privity "where a party to a previous suit was, at the time of the litigation, acting as either a fiduciary or organizational agent of the person against whom preclusion is asserted." Id.; see also id. at 186 (declining to find privity for purposes of collateral estoppel where a company's former chief

executive officer "was not vested with the authority to represent [the company] because he was neither a fiduciary nor an agent of [the company] during his trial"); Expert Elec., Inc. v. Levine, 554 F.2d 1227, 1234 (2d Cir. 1977) (holding that contractors were estopped from re-litigating issues decided in a proceeding against their agent, a professional association created to represent contractors in labor negotiations); Amalgamated Sugar Co. v. NL Indus., Inc., 825 F.2d 634, 640 (2d Cir. 1987) (holding that shareholder suit was precluded by judgment entered against a corporation in an action managed by its board of directors).

Accordingly, this Court must determine whether Iloulian had a fiduciary or agency relationship with Delta Uniforms at the time of the criminal proceedings.

As an initial matter, at the July 26, 2022 plea hearing Iloulian stated that his participation in the fraud scheme took place "under [his] company" – Delta Uniforms – from "2010 until 2022." Given that Ilouilian was indicted in 2021, Iloulian was representing that his criminal activities continued post-indictment. (Tarczynska Decl., Ex. 2 (Plea Tr.) (Dkt. No. 23-2) at 18)

Ilouilian's submissions during the criminal case also make clear that he continued to have a relationship with Delta Uniforms during the pendency of the criminal case. For example, in a March 24, 2023 sentencing submission – filed about eight months after his guilty plea – Ilouilian states that he "has been working to rehabilitate" Delta Uniforms "since the time of his arrest." (Iloulian Mar. 24, 2023 Letter, 21 Cr. 579 (Dkt. No. 56) at 2) And in an April 10, 2023 sentencing submission, Iloulian makes clear that he continues to operate Delta Uniforms:

> The Relator's false allegations . . . resulted in significant damage to Mr. Iloulian's business. Specifically, in investigating the Relator's claims, a government investigator appeared at Mr. Iloulian's customer's place of business seeking documents and other information. Worried about the inquiries made by law enforcement, that customer immediately cancelled orders. Since that time, we understand that the Relator is continuing to communicate with Mr. Iloulian's

customers about the criminal case. Each one of these customers has cancelled their orders. Mr. Iloulian is now without any pending orders, and his business is all but dead, further undermining his ability to satisfy his forthcoming financial obligations to the Government.

(Iloulian Apr. 10, 2023 Letter, 21 Cr. 579 (Dkt. No. 58) at 1)

Moreover, the Presentence Report in the criminal case – which was prepared by the United States Probation Office after Iloulian's guilty plea – states that Iloulian is "present[ly]" employed as the "owner/operator" of Delta Uniforms. (Presentence Report, 21 Cr. 579 (Dkt. No. 61) ¶ 54) Iloulian did not dispute this statement in the Presentence Report. (See Tarczynska Decl., Ex. 4 (Sent. Tr.) (Dkt. No. 23-4) at 3)

Finally, the Government has submitted a screenshot of the New York Department of State, Division of Corporations database entry for Delta Uniforms, which lists Iloulian as the chief executive officer of the company. (Pltf. June 27, 2024 Ltr., Ex. 1 (Dkt. No. 29-1) at 2)

In sum, the record demonstrates that Iloulian continued in his role as Delta Uniform's owner and operator during the pendency of the criminal case. Accordingly, Iloulian and Delta Uniforms were in privity throughout the criminal case, and Delta Uniforms is collaterally estopped from denying liability for the instant FCA claim.

## III.    **DAMAGES AWARD**

The Government seeks a total damages award of $1,287,360 against Defendants. The components of that award are (1) the trebled amount of the customs duties evaded – which amounts to $747,000 – less any amount paid in restitution in the criminal proceeding; and (2) $540,360, reflecting the "maximum FCA civil penalty for each of 20 representative shipments where Defendants knowingly misrepresented the value of the imported apparel in violation of the FCA." (Pltf. Br. (Dkt. No. 25) at 6)

**A.    Treble Damages**

Defendants who violate the FCA are "liable to the United States Government for . . . 3 times the amount of damages which the Government sustains because of the act of that person." 31 U.S.C. § 3729(a)(1).  In calculating damages, "the starting point is the total amount by which the defendant defrauded the government." United States v. Mastellone, No. 10 CIV. 7374 DLC, 2011 WL 4031199, at *3 (S.D.N.Y. Sept. 12, 2011).

On July 26, 2022, this Court entered a Consent Preliminary Order of Forfeiture in the criminal case directing Iloulian to forfeit $249,000, "representing proceeds traceable to the commission of the offense charged in Count One of the Indictment."  (Tarczynska Decl., Ex. 3 (Consent Preliminary Order of Forfeiture) (Dkt. No. 23-3) at 3)  In the April 13, 2023 judgment, this Court directed Iloulian to make restitution to Customs and Border Protection in the amount of $249,000.  (Tarczynska Decl., Ex. 5 (Judgment) (Dkt. No. 23-5) at 4)

Based on the forfeiture and restitution orders entered in the criminal case, this Court finds that Defendants evaded customs duties in the amount of $249,000.  Accordingly, Defendants are liable for treble damages in the amount of $747,000.

**B.    Civil Penalties**

In addition to treble damages, Defendants who violate the FCA are "liable to the United States Government for a civil penalty." 31 U.S.C. § 3729(a)(1).  The FCA "reaches beyond 'claims' which might be legally enforced, to all fraudulent attempts to cause the Government to pay out sums of money." United States v. Neifert-White Co., 390 U.S. 228, 233 (1968).   Thus, "[e]ach individual false claim or statement triggers the statute's civil penalty." United States ex rel. Schwedt v. Planning Research Corp., 59 F.3d 196, 199 (D.C. Cir. 1995). The inflation adjusted penalties for violating the FCA are set forth in 28 C.F.R. § 85.5, which

provides a minimum penalty of $13,946 per false claim and a maximum penalty of $27,894 per false claim.

Here, the Government seeks a civil penalty for "each of 20 representative shipments during the period 2016 through 2020 where Defendants knowingly misrepresented the value of the imported apparel in violation of the FCA." (Pltf. Br. (Dkt. No. 25) at 18) For each of the twenty shipments for which it seeks a civil penalty, the Government has submitted, inter alia, (1) the CBP Form 7501, which importers provide to Customs and Border Protection in order to list the declared "value of the merchandise, the classification, and the rate of duty applicable to the merchandise" (Pltf. 56.1 Stmt. (Dkt. No. 26) ¶ 26); and (2) the invoice Defendants received from the overseas manufacturers, which reflects the actual price paid for the goods. (Pltf. Br. (Dkt. No. 25) at 18).

The documentation submitted by the Government regarding the twenty shipments is summarized in the table below. For each shipment, the table records (1) a Customs and Border Protection "entry number" taken from the CBP Form 7501 for the shipment; (2) the "entry date" of the shipment listed on the Form 7501; (3) the declared value of the shipment on the Form 7501; and (4) the "actual value" of the shipment, which reflects the price of the goods listed on the invoice that Defendants received from various overseas manufacturers.

| # | Entry Number | Entry Date | Declared Value | Actual Value | Source[2] |
|---|---|---|---|---|---|
| 1 | CBR-0014855-5 | 10/11/2016 | $35,962 | $54,472.80 | Form 7501, Ex. 6 (Dkt. No. 23-6) at 2; Manufacturer Invoice, Ex. 7 (Dkt. No. 23-7) at 7 |

---

[2] Each of the citations in this column are drawn from exhibits appended to the Tarczynska Declaration at Dkt. No. 23.

| 2 | CBR-0014942-1 | 12/6/2016 | $30,600 | $52,020.00 | Form 7501, Ex. 8 (Dkt. No. 23-8) at 2; Manufacturer Invoice, Ex. 9 (Dkt. No. 23-9) at 5 |
| 3 | CBR-0014980-1 | 12/28/2016 | $10,215 | $17,581.50 | Form 7501, Ex. 10 (Dkt. No. 23-10) at 2; Manufacturer Invoice, Ex. 11 (Dkt. No. 23-11) at 3 |
| 4 | CBR-0015173-2 | 5/15/2017 | $13,944 | $17,544.00 | Form 7501, Ex. 12 (Dkt. No. 23-12) at 2; Manufacturer Invoice, Ex. 13 (Dkt. No. 23-13) at 3 |
| 5 | CBR-0015198-9 | 5/31/2017 | $6,678 | $11,127.60 | Form 7501, Ex. 14 (Dkt. No. 23-14) at 2; Manufacturer Invoice, Ex. 15 (Dkt. No. 23-15) at 4 |
| 6 | CBR-0015436-3 | 11/19/2017 | $4,592 | $9,243.00 | Form 7501, Ex. 16 (Dkt. No. 23-16) at 2; Manufacturer Invoice, Ex. 17 (Dkt. No. 23-17) at 3 |
| 7 | CBR-0015602-0 | 3/22/2018 | $33,709 | $65,606.44 | Form 7501, Ex. 18 (Dkt. No. 23-18) at 2; Manufacturer Invoice, Ex. 19 (Dkt. No. 23-19) at 4 |
| 8 | CBR-0015672-3 | 5/18/2018 | $14,425 | $21,883.60 | Form 7501, Ex. 20 (Dkt. No. 23-20) at 2; Manufacturer Invoice, Ex. 21 (Dkt. No. 23-21) at 3 |
| 9 | CBR-0015701-0 | 6/4/2018 | $4,836 | $7,955.88 | Form 7501, Ex. 22 (Dkt. No. 23-22) at 2; Manufacturer Invoice, Ex. 23 (Dkt. No. 23-23) at 3 |
| 10 | CBR-0015849-7 | 10/11/2018 | $9,930 | $20,423.25 | Form 7501, Ex. 24 (Dkt. No. 23-24) at 2; Manufacturer Invoice, Ex. 25 (Dkt. No. 23-25) at 4 |
| 11 | CBR-0015922-2 | 12/10/2018 | $12,159 | $18,648.60 | Form 7501, Ex. 26 (Dkt. No. 23-26) at 2; Manufacturer Invoice, Ex. 27 (Dkt. No. 23-27) at 13 |
| 12 | CBR-0016016-2 | 3/17/2019 | $6,252 | $9,093.12 | Form 7501, Ex. 28 (Dkt. No. 23-28) at 2; Manufacturer Invoice, Ex. 29 (Dkt. No. 23-29) at 3 |

| 13 | CBR-0016160-8 | 6/11/2019 | $9,114 | $15,829.20 | Form 7501, Ex. 30 (Dkt. No. 23-30) at 2; Manufacturer Invoice, Ex. 31 (Dkt. No. 23-31) at 3 |
| 14 | CBR-0016189-7 | 7/11/2019 | $11,355 | $22,563.36 | Form 7501, Ex. 32 (Dkt. No. 23-32) at 2; Manufacturer Invoice, Ex. 33 (Dkt. No. 23-33) at 5 |
| 15 | CBR-0016282-0 | 9/7/2019 | $3,763 | $7,255.00 | Form 7501, Ex. 34 (Dkt. No. 23-34) at 2; Manufacturer Invoice, Ex. 35 (Dkt. No. 23-35) at 3 |
| 16 | CBR-0016547-6 | 3/5/2020 | $11,117 | $28,365.90 | Form 7501, Ex. 36 (Dkt. No. 23-36) at 2; Manufacturer Invoice, Ex. 37 (Dkt. No. 23-37) at 3 |
| 17 | CBR-0016699-5 | 6/24/2020 | $30,540 | $59,039.65 | Form 7501, Ex. 38 (Dkt. No. 23-38) at 2; Manufacturer Invoice, Ex. 39 (Dkt. No. 23-39) at 3 |
| 18 | CBR-0016715-9 | 8/3/2020 | $2,880 | $4,838.40 | Form 7501, Ex. 40 (Dkt. No. 23-40) at 2; Manufacturer Invoice, Ex. 41 (Dkt. No. 23-41) at 3 |
| 19 | CBR-0016742-3 | 8/18/2020 | $14,232 | $21,548.40 | Form 7501, Ex. 42 (Dkt. No. 23-42) at 2; Manufacturer Invoice, Ex. 43 (Dkt. No. 23-43) at 8 |
| 20 | CBR-0016829-8 | 10/9/2020 | $9,600 | $15,624.00 | Form 7501, Ex. 44 (Dkt. No. 23-44) at 2; Manufacturer Invoice, Ex. 45 (Dkt. No. 23-45) at 10 |

In each of the twenty examples cited by the Government, the declared value of the goods as reported on the CBP Form 7501 is substantially lower than the actual price charged by the overseas manufacturers for these goods. In some cases, the manufacturers provided an invoice labelled "INVOICE FOR CUSTOME [sic]," which reflects the price eventually reported on the CBP Form 7501, and another invoice labelled "INVOICE For Payment," which reflects a higher price for the same goods. (See, e.g., Tarczynska Decl., Ex. 11 (Nov. 15, 2016 email attaching invoices) (Dkt. No. 23-11) at 3-4)

The documents provided by the Government are consistent with the "double invoicing scheme" that is charged in the Indictment, and to which Iloulian pled guilty. The Court concludes that the Government has adequately demonstrated twenty false claims that may each form the basis for a civil penalty at the rate prescribed by statute.

The Government requests that this Court impose the maximum civil penalty for each violation. (Pltf. Br. (Dkt. No. 25) at 20) The applicable regulation states that, "[f]or civil penalties assessed after February 12, 2024, whose associated violations occurred after November 2, 2015," courts should apply a penalty range of $13,946 to $27,894 per violation. 28 C.F.R. § 85.5(a). At the maximum rate of $27,894 per claim, the total requested sanction is $557,880.

Although the FCA provides "no defined set of criteria by which to assess the proper amount of civil penalties," courts have considered, inter alia, such "factors as the seriousness of the misconduct, the scienter of the defendants, and the amount of damages suffered by the United States as a result of the misconduct." U.S. ex rel. Miller v. Bill Harbert Int'l Const., Inc., 501 F. Supp. 2d 51, 56 & n.5 (D.D.C. 2007) (collecting cases); see also Mastellone, 2011 WL 4031199, at *3 ("[The defendant's] deception – defrauding a fund meant to alleviate the suffering of 9/11 victims – is sufficiently serious to warrant the maximum penalty.").

Here, Iloulian orchestrated a more than decade-long customs fraud scheme that involved "careful coordination with the overseas manufacturers and the preparation of countless fraudulent documents that were submitted to U.S. Customs officials" – all with the objective of underpaying customs duties for apparel imported into the United States. (Tarczynska Decl., Ex. 4 (Sent. Tr.) (Dkt. No. 23-4) at 18) And the twenty examples selected by the Government draw from only five years of what was a more than decade-long fraud scheme, and thus "constitute

only a small subset of the 'countless fraudulent' statements Defendants caused to be made to CBP." (Pltf. Br. (Dkt. No. 25) at 20)

Given (1) the long-running nature of the fraud scheme; (2) Iloulian's high degree of scienter; and (3) the fact that the twenty examples cited by the Government constitute only a small fraction of the "countless" fraudulent invoices prepared during the course of the fraud scheme, the maximum penalty of $27,894 per claim is appropriate. Accordingly, a total civil penalty of $557,880 is assessed against both Defendants.

## CONCLUSION

For the reasons stated above, the Government's motion for summary judgment (Dkt. No. 22) is granted. The Clerk of Court is directed to (1) terminate the motion (Dkt. No. 22); (2) enter judgment against Defendants Iloulian and Delta Uniforms in the total amount of $1,304,880, which reflects treble damages of $747,000 and civil penalties of $557,880; and (3) close this case.

Dated: New York, New York
      July 25, 2024

SO ORDERED.

Paul G. Gardephe
United States District Judge